## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:20-cv-22234-MARTINEZ-BECERRA

| | |
|---|---|
| LINCO ENTERPRISES, INC.<br><br>     Plaintiff,<br><br>v.<br><br>OLEG FIRER, EZ CAPITAL FUND, LLC,<br>STAR CAPITAL MANAGEMENT, LLC,<br>and STAR EQUITIES, LLC,<br><br>     Defendants.<br>_____ | **1.** Violation of the Securities Exchange Act of 1934 15 U.S.C. § 78j(b); Rule 10b-5; 17 C.F.R. § 240.10b-5;<br>**2.** Liability of Controlling Persons, 15 U.S.C. § 78t;<br>**3.** Violation of the Florida's Securities Investor Protection Act, Fla. Stat. § 517.011 *et seq*.;<br>**4.** Enforcement of Inspection Rights, Fla. Stat. § 605.0411;<br>**5.** Fraudulent Misrepresentation;<br>**6.** Judicial Dissolution of EZ Capital Fund LLC, Fla. Stat. §§ 605.0702, 605.0703. |

### SECOND AMENDED COMPLAINT

The plaintiff, Linco Enterprises, Inc. ("Linco"), sues the defendants, Oleg Firer, EZ Capital Fund, LLC ("EZ Capital"), Star Capital Management, LLC ("Star Capital"), and Star Equities, LLC ("Star Equities").

### INTRODUCTION

1.    Firer and his sidekick, Gary Gelman, ran an illicit fundraising and money management scheme in violation of the Federal and State securities laws.[1]

2.    Firer induced Linco's sole owner and principal, Sergey Khazarov, to invest through Linco in three closely held Florida companies. In a nine-month period between March 27 and November 9 2017, the unsophisticated plaintiff invested $1,693,000.00 in the three companies. The three companies were EZ Capital, Star Capital and Unified Advance, LLC ("Unified

---

[1] Gelman is no longer being sued in this lawsuit because of a release (the "Release") produced by defendants' attorney in discovery.

Advance").[2]

3.      Firer, individually and as managing member of Star Equities, and Gelman lied that they had supposedly made substantial capital contributions to the three companies, when, in fact, they made no capital contributions. Firer and Gelman made other false and misleading statements and non-disclosures. They lied about the use that would be made of Linco's contributions, the assets of the three companies in which they sold investments to Linco, and the value of the assets.

4.      The investments sold to Linco were of two types: non-voting membership interests in the three companies and so-called investor's or investment portfolios. As to the investment portfolios in EZ Capital's Russian subsidiary, Linco has decided to no longer make these claims in this lawsuit. Instead, Linco seeks to recover $1,480,000 for the membership interests in the three companies and an investment in a domestic investment portfolio.

## PARTIES

5.      Linco is a Florida corporation, having Sergey Khazarov, a Russian national, as its sole owner and president.

6.      Firer is an individual residing and doing business within this judicial district.

7.      Star Equities is a Florida limited liability company within this judicial district.

8.      EZ Capital is a Florida limited liability company within this judicial district.

9.      Star Capital is a Florida limited liability company within this district.

## JURISDICTION AND VENUE

10.      Section 78aa of the Securities Exchange Act of 1934 grant this Court jurisdiction over claims asserted in Counts I and II. Additionally, pursuant to section 78aa, venue is proper in

---

[2] As the Release extinguished claims against Unified Advance, Linco has dropped this defendant too.

this Court, because the Defendants are found or are an inhabitant or transact business in this judicial district. This Court has supplemental jurisdiction over the state law claims asserted by Linco under section 1367 of Title 28.

<u>**BACKGROUND ALLEGATIONS**</u>

**November 2016 to December 2017**

11.    In November 2016, Sergey Khazarov, then in his early twenties, met Gary Gelman, then in his mid-forties, as each traveled through the Charles De Gaulle Airport. While waiting to board connecting flights to New York, Gary Gelman introduced himself as the president of VG Financing, LLC ("VGF") in Moscow, Russia.[3]

12.    In December 2016, after Khazarov and Gelman had exchanged contact information, Gelman, while in Moscow, telephoned Khazarov to have dinner. Gelman said he would bring along some "friends," one of which turned out to be Oleg Firer.

13.    After dinner, Firer invited Khazarov and Gelman to Firer's "Sky Apartments" in Moscow. Throughout the evening, in casual conversation, Khazarov was told that Firer and Gelman, long-time friends and associates, both from Miami, were Ukrainian born U.S. citizens who had invested together for years in Russia and the United States, and that Firer was the head of Net Element, Inc. ("Net Element"), a big technology company, and was about to become an ambassador to Russia from an island nation in the Caribbean. Gelman mentioned investment opportunities that Khazarov might wish to consider Gelman in the merchant cash advance business, a form of financing in which small lump-sum payments are given to small businesses in exchange for an agreed-upon percentage of future revenues or sales. Though Gelman did much of

---

[3] In Russian, the VG Financing's name is Общество с Ограниченной Ответственностью "Виджи Файнэнсинг," which word-for-word transliterates as "Limited Liability Company VG Financing."

the talking, Firer listened, chimed in at times, and contradicted nothing Gelman said.

14.     Before Gelman left Moscow in December 2016, he specifically mentioned the "merchant cash advance" business of VGF and the opportunity for Khazarov to invest in this business.

15.     Gelman returned to Moscow in January 2017 and invited Khazarov for more "wining and dining" in Moscow. There, Firer and Gelman met with Khazarov alone and also with others, including Roman Khomenko from Ukraine and his brother Oleg, also Ukrainian born yet living in Grenada. Firer invited Khazarov and Gelman to Firer's "Sky Apartments" for a presentation about the creation of a casino in Grenada's embassy soon coming to Moscow.

16.     Before Gelman left Moscow, he suggested Khazarov visit him and Firer one day in the United States. Gelman's discussions with Khazarov about business investments continued by phone and text after Gelman returned to Miami. In the phone calls, Gelman emphasized more than once the "synergy" between investments Khazarov could make with Gelman and a subsidiary of Net Element by the name of Unified Payments, which provided transaction processing to merchants around the world.

17.     In late February 2017, Khazarov confided in Gelman that he was very excited to be coming to the United States to discuss possible investments with him and Firer. Gelman told Khazarov that if he really planned on investing, then it would be a good idea to prepare himself to do so by creating an investment vehicle. When Khazarov asked what this entailed, Gelman said "not to worry," he would help Khazarov complete the process. In this manner, about two weeks before Khazarov left for the United States, Gelman helped Khazarov establish Linco, the Florida corporation through which Khazarov would invest substantial sums of money.

*Investments in EZ Capital and Unified Advance*

18.     In March 2017, Khazarov traveled to the United States. Before this trip, Khazarov had never considered investing in the United States, nor did he know anything about "unregistered securities" or even heard the phrase.

19.     In March 2017, over the course of several days, Khazarov had conversations face-to-face with Firer and Gelman in New York and Florida. To Khazarov, both appeared to be knowledgeable entrepreneurs with expertise in raising capital by the sale of stock. Gelman was twice the age of Khazarov and Firer was in his late thirties. Firer mentioned that he had bought, sold, and grew various businesses and that he was currently an investor in and CEO/Director of Net Element, a public company traded on the NASDAQ Exchange. Gelman also claimed expertise in growing businesses, stating that the "merchant cash advance" business of VGF was one of his and Firer's current projects.

20.     On or about March 19, 2017, while sitting at a café in the Little Odessa neighborhood in Brooklyn, New York, in the presence of Firer, Gelman discussed the investment opportunities that he and Firer had for Khazarov.

21.     Gelman described EZ Capital as a holding company that owned VGF, a provider of loans to small businesses in Moscow. He described Unified Advance as a Florida company that issued credit cards to merchants for cash advances. Both Unified Advance and VGF were then allegedly operating and doing business.

22.     Gelman stated that for $300,000 Khazarov could obtain a five percent (5%) interest in EZ Capital, then equally owned by Gelman and Firer.

23.     For another $300,000, Khazarov could obtain a ten percent (10%) interest in Unified Advance, also then equally owned by Gelman and Firer.

24.     Gelman clarified there were no other investors in EZ Capital and Unified Advance.

25.     Gelman concluded, that by making two investments, Khazarov would increase his opportunity for success, as at least one of the companies would likely go public or be sold to a much larger company.

26.     According to Gelman, bringing a company public or selling off its business required a special talent that he and definitely Firer supposedly had.

27.     After Gelman had described the investments offered, Firer suggested to Khazarov, "why don't you talk to Gary some more and then let us know if you are still interested."

28.     Everyone then traveled to Miami, Florida. While there, Khazarov directed additional questions to Gelman just as Firer had suggested. In three separate conversations on Lincoln Road and in the Bal Harbour Shops over two consecutive days in March, 2017, Gelman provided the following information in response to questions asked by Khazarov.

29.     Khazarov asked Gelman about the total contributions of Firer and Gelman to EZ Capital and Unified Advance. Gelman answered, "millions of dollars" have been contributed. When Khazarov asked for what purpose, Gelman stated, that he and Firer had paid for all the necessary infrastructure of VGF and Unified Advance and initial working capital.

30.     When Khazarov asked about financial information, Gelman stated that VGF, the subsidiary of EZ Capital, was already making loans to merchants and that Gelman and Firer expected annual sales therefrom to be not less than $2 million in two to three years. Gelman also stated that Unified Advance was issuing cards to merchants in the United States and had done about $200,000 in business.

31.     Khazarov asked rhetorically, if the companies were already in business, why did Gelman and Firer want $600,000 from Khazarov. Gelman stated that they wanted to use

Khazarov's capital to "grow business" and then exit in three to four years after distributing net profit annually. Gelman said that Khazarov's capital would develop additional banking relationships for VGF and expand its operations outside Moscow. For Unified Payments, Khazarov's capital would be used to "scale the business" and launch other financial products besides the credit for merchants.

32.     The oral representations in Brooklyn and Miami about EZ Capital Fund and Unified Advance were false for the following reasons:

    a.    Another person was also an owner of EZ Capital and Unified Advance. According to Linco's investigation for this action, Roman Khomenko contributed $300,000 to EZ Capital and $150,000 to Unified Advance in 2016. Even though Gelman and Firer introduced Khazarov to Roman Khomenko, they never disclosed that Khomenko had contributed $300,000 for a thirteen and one-third percent (13.3%) interest in EZ Capital and $150,000 for a ten percent (10%) interest in Unified Advance.

    b.    Instead of "millions of dollars," Firer and Gelman contributed no cash or negligible cash to EZ Capital and Unified Advance. ██████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████ Unified Advance filed no tax returns for 2017-18. ████████████████████████████████████████████████████████████████ which is permitted only in the case of a single member LLC. *See* IRS Publication 3402 (rev. Mar. 2020),  https://www.irs.gov/forms-pubs/about-publication-3402. ████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆

c.   Besides contributing nothing to EZ Capital and Unified Advance, Firer and Gelman drained these companies in 2017. Upon information and belief, ▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Meanwhile, ▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

d.   Gelman and Firer never intended a profitable "exit" for Khazarov because they knew his and Khomenko's capital contributions was the only capital that Gelman and Firer would use to operate EZ Capital and Unified Advance.

33.   Without knowledge that the cash contributions of Firer and Gelman were non-existent, that Roman Khomenko's interest in the companies and capital contributions had been concealed, and that VGF and Unified Advance had nominal assets, Khazarov agreed to invest.

34.   Gelman asked Khazarov to meet him and Firer at the executive offices of Net Element in Sunny Isles, Florida on or about noon of March 27, 2017. Upon arrival, Khazarov found Gelman and Firer waiting for him. Gelman stated that the investment documents had been prepared by Firer and would be printed out for execution. Once printed, the operating agreements were first signed by Gelman and Firer, who then handed the documents to Khazarov with a pen and pointed out where Khazarov should sign.

35.   Before doing so, Khazarov asked if the documents made clear his interest in the

companies. Firer pointed out the one-page chart in Exhibit A to each operating agreement that set forth each member's ownership interest. In the operating agreement for EZ Capital, Khazarov saw on this page that Firer, through Star Equities, and Gelman, personally, each contributed $1,500,000 to EZ Capital for a forty-seven and one-half percent (47.5%) interest in the company and that Linco must contribute $300,000 for a five percent (5%) interest. In the operating agreement for Unified Advance, Khazarov read that Firer, through Star Equities, and Gelman, personally, each contributed $750,000 to Unified Advance for a forty-five percent (45%) interest in the company and that Linco must contribute $300,000 for a ten percent (10%) interest. Looking at the chart, Khazarov asked Firer what is "Star Equities," to which Firer responded, it was a company through which he made investments likes this. Satisfied, Khazarov signed the operating agreements, the parties shook hands, and Firer and Gelman began calling Khazarov their "partner."[4]

36.     In fact, the operating agreements that Firer had Khazarov signed were false. Just like Gelman's oral representation that "millions of dollars" had been contributed by him and Firer, the exhibits falsely represented total contributions to these companies by Star Equities and Gelman of $4 million. In fact, Star Equities and Gelman contributed no cash or negligible cash to these companies and nothing else remotely worth $4 million.   The documents misstate who the owners were by omitting Roman Khomenko's 10% interest in Unified Advance and 13.3% interest in EZ Capital.

37.     Nothing contradicted or corrected any of the oral or written misrepresentations before Khazarov left Miami. Upon return to Moscow, Khazarov, on behalf of Linco, wired

---

[4] According to the operating agreements and the manner in which EZ Capital and Unified Advance were operated, Linco was a minority member without any say in management, and, therefore, dependent upon Star Equities and Gelman, the voting members with the exclusive right to manage these companies.

$300,000 to Unified Advance on March 29, 2017 and $300,000 to EZ Capital the next day.

38.     Khazarov would not have invested in either company if he knew the truth about the owners, the contribution each owner made, the assets of the companies, and the true use to be made of Linco's contribution.

### Additional Investments in Unified Advance and EZ Capital

39.     On or about April 6, 2017, Firer became Grenada's first ambassador to Russia. When Khazarov congratulated Firer on his appointment, Firer congratulated Khazarov on having become his "partner." Firer orally represented to Khazarov that he believed his appointment would benefit VGF and Unified Advance.

40.     After Firer's appointment, Gelman told Khazarov that VGF was having such success that there were more loans "in the pipeline" than VGF could fund and that VGF would soon cement a relationship with Russia's largest bank, Sberbank. According to Gelman, VGF's growth was about to "explode."

41.     In April 2017, still believing Star Equities and Gelman had contributed $1.5 million of their own funds to Unified Advance, Khazarov paid $100,000 to Unified Advance for an investment portfolio of cash advances to merchants to whom Unified Advances issued credit cards.

42.     If Khazarov knew the truth about the contributions of Star Equities and Gelman and the fact that other than contributions by Linco and Khomenko Unified Advance had no assets, he would not have made this $100,000 investment for Linco.

43.     In the second quarter of 2017, while Firer was in Moscow, Khazarov mentioned the growth reported by Gelman, of which Firer said he was aware, and Khazarov then asked if Firer and Gelman would be willing to reduce their interests in EZ Capital so Linco could obtain another five percent for another $300,000 contribution. Firer responded, "I want everyone to be happy, so

why not?"

44.     During the last week of July 2017, in the kitchen of Gelman's "Sky Apartments" in Moscow, Firer produced for signature a three-page document, also prepared by him, which was an amendment to the operating agreement for EZ Capital (the "Amendment for EZ Capital"). Once again, the document prepared by Firer falsely stated that he, through Star Equities, and Gelman each supposedly contributed $1.5 million to EZ Capital. Khazarov saw the document also stated that Linco contributed $600,000 for a ten (10%) interest in the Company with a forty-five percent (45%) interest for Star Equities and Gelman. No prior representations or omissions were disclosed before the Amendment of EZ Capital was signed.

45.     On July 26, 2017, Khazarov, on behalf of Linco, wired another $300,000. Previously, Gelman had identified the payee to which Khazarov was supposed to make payment. In this instance, Firer told Khazarov to pay Star Equities for the additional five percent.

### Investment in Star Capital

46.     In July 2017, Firer and Gelman reverted to having discussions in front of Khazarov about the opportunities in Grenada. During a trip that month to Kazakhstan, Gelman told Khazarov that Firer wanted Khazarov to be the "head" of the Grenadian Trade House affiliated with Grenada's Embassy in Moscow.

47.     Later in this trip, at a poolside bar in the Ritz Carlton Hotel located in Astana, Kazakhstan, Firer and Gelman had a conversation with the Khomenko brothers about Grenada and a business entity that the parties referred to as "Star Development." In Khazarov's presence, Firer and Gelman led a conversation in which they made clear that another business entity referred to as "Star Capital" would own fifty percent of Star Development and the Khomenko brothers would own the other fifty percent. According to the conversation, Star Development would purchase the

land in Grenada where Star Capital would build a hotel.

48.    In September 2017, Firer invited Khazarov to meet with him and Gelman at Grenada's Embassy located on Moscow's Embassy Row. [5]

49.    At this meeting, Firer and Gelman "pitched" for Khazarov's investment in Grenada. Gelman described "Project Boeuf" as their plan to develop a small hotel, on a 3.67-acre parcel located at Parc a Boeuf, on Groom's Beach, in the St. George Parish, Grenada. Gelman stated that they would pool their capital and use a portion to obtain fifty percent of Star Development and what remained to obtain financing. Firer said the construction financing would come from either a bank or Grenada's Citizenship by Investment Program ("CBI Program") or an investor. Firer and Gelman both represented that once the hotel was built, Star Capital would make millions by managing the hotel or selling it to another investor.

50.    In the following weeks, Firer and Gelman pretended to grow closer to Khazarov. For example, they attended his birthday party in Moscow with their wives and they simultaneously disclosed to Khazarov information that seemed sensitive. For example, as Firer solicited Khazarov's investment in Grenada, he revealed information about Grenada's mission in Moscow, and asked Khazarov to represent Firer's interest as shareholder of Grenada's Trade House in Moscow. Similarly, Gelman confided in Khazarov that he was about to fire the CEO of VGF.

51.    In October 2017, Firer sent Khazarov an official invitation to travel to Grenada the following month for the "New Dawn" economic forum. Khazarov decided he would go.

52.    While there in November 2017, Gelman and Oleg Khomenko, with the knowledge of Firer who saw them leave for this purpose, drove Khazarov to Groom's Beach and other real

---

[5] Time and again, Defendant Firer used the Grenadian Embassy in Moscow as a front to advance his personal affairs and business.

estate supposedly under consideration for future development by Star Development.

53.   Back at the hotel in Grenada, Gelman laid out a proposal that he and Firer were making to Khazarov in Grenada. According to Gelman, Khazarov was not to discuss the proposal with the Khomenkos. Gelman said details about this investment, like Khazarov's previous investments, were considered confidential by Firer and Gelman and not to be shared with the Khomenkos. Gelman's offer went as follows:

54.   Consistent with the discussions in July 2017 in Kazakhstan, Gelman repeated the relationship between Star Capital and Star Development. Star Development owned the land, and Star Capital owned fifty percent of Star Development. Gelman stated it would be better to invest in Star Capital than investing or lending to Star Development. By investing with Star Capital, Khazarov would be part of a company that held an interest in Star Development equal to the collective interests of the Khomenko brothers in Star Development. In addition, Star Capital, not Star Development, would arrange financing to build the hotel, and, therefore, earn more profits from Project Boeuf.

55.   Gelman stated that the profit forecast had recently increased because the land on Groom's Beach (the "Land") was acquired for only $3,200,000. According to Gelman, the Land was worth $5,000,000, the price Star Development had expected to pay. According to Gelman, the difference of $1,800,000 meant more profit awaited Star Capital. Alternatively, the price reduction meant a more than sufficient reserve to obtain financing from a bank or the CBI Program.

56.   The oral representations about the relationship between Star Capital and Star Development and the alleged purchase of the land by Star Development were all false.

57.   Star Capital was not then, nor did Gelman or Firer ever intend for it to become a fifty percent member of Star Development, and, therefore, Star Capital did not have any interest

in the land, either directly or indirectly.

58.     In fact, Star Development had not acquired the land in 2017 for $3,200,000 million. According to the real estate records in Grenada, Star Development would not acquire the land until January 2018 when Star Development paid only $1,450,000 to Hopkin Limited, another fact never revealed to Khazarov.

59.     Khazarov asked the cost for him to invest in Star Capital. Gelman said it would cost Khazarov $464,000 plus one-third of Firer's expenses for the economic forum.

60.     When Khazarov asked why he must pay expenses unrelated to Star Capital, Gelman interrupted, stating partners must support each other and this would be required of Khazarov to make an investment in Star Capital. Khazarov acquiesced, and Gelman stated upon their return to Miami they would meet with Firer to sign an investment document for Star Capital.

61.     Back in Miami, the parties met in Net Element's office in Sunny Isles. As the meeting commenced, Firer confirmed that he had spoken with Gelman about the conversations in Grenada and understood Khazarov wished to proceed. Khazarov confirmed that he did.

62.     Firer again provided a document he had already prepared. On this occasion, the document entitled Amendment No. 1 to the Limited Liability Company Agreement of Star Capital Management, LLC (the "Amendment for Star Capital") was only three pages.[6]

63.     Khazarov reviewed the document for the contributions and percentage interests for each member. According to the Amendment for Star Capital, Khazarov received a 16.6 percent interest for $464,000. Firer, through Star Equities, and Gelman each received a 42.5 percent

---

[6] According to discovery responses, the Amendment to Star Capital refers to an operating agreement that does not exist. According to Florida law and the manner in which this company was operated, Linco was a minority member at all times dependent upon Star Equities and Gelman to achieve profits for all members.

interest for a capital contribution by each of $1,158,000.

64.     The Amendment for Star Capital was false. Star Equites and Gelman made no capital contributions to Star Capital.

65.     According to an operating agreement for Star Development secured during Linco's investigation for this lawsuit, Firer, individually, and Gelman, individually, each contributed $1,000 to obtain for a twenty percent (20%) interest for himself in Star Development. Neither Firer nor Gelman ever disclosed their concurrent interests in Star Development and Star Capital.

66.     Unaware that the capital contributions by Star Equities and Gelman according to the Amendment for Star Capital were falsely stated, that Star Capital owned no interest in Star Development, that Firer and Gelman had a conflict of interest, or the truth about the land acquisition, Khazarov executed the Amendment for Star Capital on behalf of Linco.

67.     If Khazarov had known Star Equites and Gelman made no investments in Star Capital, that Star Capital had no ownership interest in Star Development, that Firer and Gelman had invested in Star Development, that Star Development had not purchased the land or that it would not purchase the land until January 2018 for only $1.450 million, and that Star Capital's only asset was Linco's capital contribution, Khazarov would not have executed the Star Capital Amendment.

68.     Firer told Khazarov that his wire to Star Equites for Linco's interest should be for the amount of $480,000 and sent to Star Equites.  From what Khazarov saw in Grenada, the events at the economic forum cost much less than $16,000.

69.     Once back in Moscow, on November 19, 2017, Khazarov wired $480,000 for Linco to Star Equites.

70.     Linco's contribution was never turned over to Star Capital. Instead, Firer

commingled in a financial account of Star Equities that he controlled all of the contributions from Linco, the Khomenkos, and another investor in Star Development.

71.     As calendar year 2017 came to an end, Linco had spent $1,480,000 million for all of its investments in Star Capital, Unified Advance, and EZ Capital (collectively, the "Closely Held Companies"). The investments were valueless because none of the Closely Held Companies received the capital contributions misrepresented by Firer and Gelman, the Closely Held Companies had no assets of any significance besides the contributions made by Linco and Khomenko. The plan of Firer and Gelman was to use contributions of the Closely Held Companies for the benefit of themselves and their affiliates without any regard for Linco's interest.

**First Quarter of 2018 until December 2019**

72.     Beginning in the first quarter of 2018, after the CEO of VGF resigned, Gelman asked Khazarov to become the acting CEO for a monthly salary of $1,000. After agreeing, Khazarov, discovered he was merely a figurehead and "CEO" in name only. Gelman, as VGF's president, reported to Firer who called the shots. Khazarov was expected to perform random assignments by Gelman, who asked for help with either mundane matters or when Gelman announced a "crisis" due to a problem in VGF's office that arose from his neglect or provocation.

73.     In May 2018, Khazarov received a report that VGF's net profits in 2017 was only $50,000, which report contradicted an announcement by Gelman in December 2017 that VGF had net profits for 2017 that would be divided among Gelman, Firer, Khazarov. After ignoring Khazarov's multiple requests for a year-end report on the results of VGF's operations in 2017, Gelman told Khazarov he would not receive any dividends because the profits were being reduced by eighteen percent VAT and other unanticipated costs.  Khazarov asked Gelman how this could happen after Gelman previously announced dividends and never mentioned VAT before Linco

invested. Gelman responded that the situation was "beyond his control" and that partners must "share problems as well as profits." Gelman also mentioned that he and Firer had contributed millions of dollars to EZ Capital already and that Gelman was himself still "investing" money every month to cover for the expense of international travel.

74.     In the last quarter of 2018, Khazarov questioned Gelman about his previous oral representations that VGF's business had grown in 2017. Khazarov stated that he saw no evidence of any growth. Gelman assured Khazarov that all was fine and only a little more time was needed for Khazarov to see results.

75.     In the last quarter of 2018, Khazarov asked for more compensation or to be relieved of the CEO position, which was not a real job but merely an annoyance, to which Gelman responded he would discuss with Firer.

### *Linco's Liquidation of Investments in Unified Advance*

76.     By the second quarter of 2019, having received no specific information about the investments, Khazarov was concerned about the investment of $300,000 in Unified Advance, a company that Khazarov has since learned that Gelman and Star Equities permitted to be administratively dissolved in 2018 without the knowledge of or any notice to Khazarov.

77.     Khazarov asked Firer, who supposedly had $750,000 invested in Unified Advance, if he would purchase Khazarov's five percent interest in the company. Firer revealed that he was supposedly "retired" and not interested in new investments.

78.     In May 2019, Khazarov requested that Gelman liquidate his portfolio investment in Unified Advance. In response, Gelman made his first negative report about the Closely Held Companies. Gelman said to Khazarov that Unified Advance was "not profitable" and had "troubles." Gelman added that he could probably liquidate Linco's portfolio investment quickly

and provide Linco with $150,000. Khazarov asked Gelman to go ahead and do that.

79.     In June 2019, after a dinner party with Firer, Gelman, and others, as Khazarov left the party, Gelman asked Khazarov to step inside Firer's diplomatic vehicle to sign a document to secure a return of $150,000 for his portfolio investment in Unified Advance. Linco signed the document without reading it and then misplaced his copy. [7] This document, however, was later produced by defendants in response to Linco's first request for production of documents during this lawsuit. After receiving legal advice and counsel about the meaning of this document, which communication is protected by the attorney-client privilege, Linco chooses not to assert claims against Unified Advance and Gelman in this amended pleading.

### Linco's Liquidation of Investment in Star Capital

80.     By the third quarter of 2019, after specific questions of Gelman went unanswered for many months, Khazarov still knew nothing specific about development of the hotel nearly two years after the investment. Neither Firer nor Gelman shared any specific information about financing through the CBI Program or a bank, licensing from either Hilton or another company to build a hotel, or construction permitting.

81.     Believing that Firer might be more willing to purchase Linco's interest in Star Capital as he had been told that entity held a fifty percent interest in valuable Land, Khazarov decided to approach Firer about a buyout, Firer repeated that he was "retired." This prompted Khazarov to ask Firer when would the hotel be built. In response, Firer stated that the timeline was up to the Khomenkos, whom he understood were going forward with Project Boeuf. A short time later Gelman said he expected good news soon as a wealthy Canadian was interested in the land.

---

[7] In Plaintiff's pre-suit communications with Unified Advance, Plaintiff requested a copy of this agreement, which Unified Advance refused to provide.

82.     In August 2019, Gelman texted Khazarov that Star Capital had agreed to discount its interest in Project Boeuf to Roman Khomenko a/k/a "Roma." Not long thereafter, Gelman and Firer met Khazarov in a restaurant in Moscow to explain what Star Capital would do with its investment in Star Development and Project Boeuf. There they made the following statements:

a.     Gelman stated that the Canadian investor made a low-ball offer for the land, which the Khomenko brothers would not accept, creating a deadlock for Star Development between the fifty percent interest of Star Capital and the fifty percent interest of the Khomenko brothers;

b.     The Khomenkos offered to buy Star Capital's interest in Project Boeuf, which Firer and Gelman accepted on behalf of Star Capital, requiring the members to share a loss;

c.     Khazarov asked his "partners" why they would permit the Khomenkos to force a loss upon Star Capital only to walk away from the plan to construct the hotel;

d.     Gelman said that Oleg Khomenko was under criminal investigation. According to Firer, the investigation made it best for all of us to accept a loss and move on with life.

83.     These statements were false and misleading for the following reasons:

a.     Upon information and belief, i.e., an operating agreement for Star Development provided by Leon Goldstein and another operating agreement provided by the Khomenko brothers, Star Capital was never a member of Star Development, a fact concealed by Firer;

b.     Upon information and belief, including the operating agreements for Star Development obtained by Linco, the voting interests of the members were such that there could be no deadlock in Star Development based upon a disagreement between the Khomenko brothers, on the one hand, and Firer and Gelman, on the other hand.

c.     The Khomenkos did not buy out Star Capital's interest in Project Boeuf. Instead, Gelman and Firer decided on their own to cancel Linco's interest in Star Capital to get Khazarov

"out of their hair." The Khomenkos are neutral about Star Capital and the fraud committed against Khazarov because, in fact, Star Capital owns no interest in Star Development.

        d.   The development of "Project Boeuf" did not occur because Gelman, Star Equities and Firer did not contribute any capital, apply for financing, or obtain licensing from the Hilton due to Firer's negative history.

        e.   There was no investigation commenced or even threatened against Oleg Khomenko. Firer and Gelman invented this story to divert Khazarov's attention from their own wrongdoing. Finally, as neither Star Equities nor Gelman made any contributions to Star Capital, Khazarov alone has borne a loss.

84.    On September 11, 2012, Khazarov signed papers to accept $420,000 for the sale of Linco's interest in Star Capital. The papers were also false and misleading as they represented that Star Capital "owns equity in the 159,865 square foot (3.67 acre) parcel" on Groom's Beach. In fact, Star Capital has no interest in the Land or in the company that took a deed to the land in January 2019, Star Development.

85.    After Khazarov signed the papers, Star Equities quickly wired $420,000 to Linco. In this manner, Firer and Gelman sought to rid themselves of claims by Linco.

86.    Besides the $250,000 loss on the investments in Unified Advance and the $60,000 loss on the investment in Star Capital, Linco has sustained a total loss of its $600,000 investment in EZ Capital. Thus, Linco seeks to recover at least $910,000 in this lawsuit.

87.    At all material times, Linco's ten percent (10%) interest in an unmarketable, minority interest in EZ Capital has been devoid of value.

        a.   Linco has not received any return on its $600,000 investment made in 2017.

        b.   ████████████████████████████████████████

████████████████████████████

      c.   ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████. [8]

**First Half of 2020**

88.     By happenstance, in early 2020, Khazarov learned that another investor made a contribution of $840,000 to Star Development. This other investor, Leon Goldstein of Sunny Isles, was not disclosed to Khazarov by Gelman or Firer.

89.     On his own, Khazarov learned that, on December 5, 2017, Goldstein sent to Star Equities his $840,000 contribution in Star Development. Goldstein's contribution was commingled with Linco's money and whatever was contributed by the Khomenkos in an account of Star Equities. [9]

90.     Upon information and belief, i.e., account statements provided by Star Equities in discovery in this action, Linco's wire of $480,000 to Star Equities and the $840,000 contribution for Leon Goldstein in December 2017 were used to pay for the Land in January 2018.

91.     After Linco and Goldstein learned that their investments with Star Equities and Gelman had been concealed from one other, each sought legal advice and counsel.

92.     In April 2020, Linco's counsel began to investigate the underlying facts. One aspect of the investigation was to request records from the Closely Held Companies, including Star

---

[8] Recently, an investor in VGF has sued to recover $474,000 loaned to VGF. Upon information and belief provided through a former employee of VGF, the amount in dispute is approximately seventy-five percent (75%) of VGF's total portfolio investments. Further, VGF no longer has an office in Moscow and has terminated most of its employees.

[9] The operating agreement for Star Development that identified contributions of only $1,000 by Firer and Gelman also showed a $1,000 contribution by each Khomenko brother.

Capital, pursuant to Section 605.0410 of the Florida Statues. Star Capital refused for the reason that Linco supposedly was not a dissociated member of Star Capital.

93.     Based upon facts learned in this investigation and the refusal of any of the Closely Held Companies to provide records or information to Linco, this lawsuit was filed on May 29, 2020.

94.     Linco has hired the undersigned attorneys to represent Linco in this action and has agreed to pay them reasonable fees for their services.

95.     At all relevant times, a fiduciary relationship existed between Plaintiff and EZ Capital, and between Plaintiff and Star Capital, by virtue of Plaintiff being a member in the Closely Held Companies; a relationship in which Plaintiff put its trust to protect Plaintiff's financial interests and the Closely Held Companies, acting through their respective managers Star Equities and Gelman, accepted that trust. Additionally, as a majority interest holder in the Closely Held Companies, Star Equities owed Plaintiff, a minority interest holder, a fiduciary duty of loyalty.

96.     At all relevant times, Defendants have made representations, acknowledged, and/or manifested to Plaintiff that they are each other's agents and have acted within the scope of their respective duties when made representations and misrepresentations as alleged herein. All of Plaintiff's payments made to EZ Capital, Unified Advance, and to Star Equities, were as a result of Plaintiff's reasonable belief in truthfulness of Defendants' representations and/or manifestations that they are and were each other's agents, and Plaintiff's payments were an expression of Plaintiff's change in its position.

### COUNT I: VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934
### 15 U.S.C. § 78j(b); RULE 10b-5; 17 C.F.R. § 240.10b-5
### [EZ CAPITAL, STAR CAPITAL, STAR EQUITIES]

97.     Linco restates here its background allegations above.

98.     Between March 27, 2017 and November 16, 2017, on specific dates as more particularly alleged above, EZ Capital, Unified Advance, Star Capital, and Star Equities, sold Linco investments in a commercial and/or financial business enterprises with the expectation that profits or other gain would be produced by others. The membership units in the Closely Held Companies as well as "investor's portfolio" in Unified Advance constitute securities.

99.     Defendants EZ Capital, Star Capital, and Star Equities, and Unified Advance, sold Plaintiff investments using instrumentalities of interstate commerce, such as mails, telephone, Internet, and/or other form of electronic communication, in connection with the purchase or sale of the securities.

100.    Defendants EZ Capital, Star Capital, Star Equities, and Unified Advance employed a device, scheme, or artifice to defraud – alleged in paragraphs 1–4, 21–27, 29–38; 40–45; and 46–87 – in connection with the purchase or sale of a security.

Alternatively, Defendants EZ Capital, Star Capital, Star Equities, and Unified Advance made a misrepresentation of a material fact, or omitted a material fact – alleged in paragraphs 1–4, 21–27, 29–38; 40–45; and 46–87 – in connection with the purchase or sale of a security.

Alternatively, Defendants EZ Capital, Star Capital, Star Equities, and Unified Advance engaged in an act, practice, or course of business – as alleged in paragraphs 1–4, 21–27, 29–38; 40–45; and 46–87 in connection with the purchase or sale of a security – that operated or would operate as a fraud or deceit on any person.

101.    Neither before, after, or at the time of signing the operating agreements and the Amendments for EZ Capital and Star Capital did the defendants accurately state the capital contributions by Gelman and Star Equities to any of the Closely Held Companies. These

misrepresentations and omissions were made to induce Linco to purchase securities that had little

to no value because the capital contributions that the defendants never made left the Closely Held

Companies undercapitalized and without the assets and infrastructure falsely represented to be in

place. As a result, the securities purchased by Linco were devoid of value. The purchase by Star

Equities of Linco's interest in Star Capital was not an arm's length sale nor an indication of value.

Instead, Star Equities paid for Linco's interest in Star Capital with the hope that by reducing

Linco's losses on Star Capital, Khazarov would forego legal action.

102.    As the representations and omissions concerned contributions to the Closely Held

Companies by Star Equities, a company that Firer controls, he certainly knew whether or not Star

Equities had contributed $3,408,000 to the Closely Held Companies. At the minimum, Firer was

severely reckless. Given the close relationship between Firer and Gelman, Firer likely knew the

false and misleading nature of Gelman's misrepresentations and omissions about his contributions.

The contradictory statements in the tax returns that negate the alleged contributions by Star

Equities and Gelman to EZ Capital and Unified Advance can be imputed against Firer who was

the Tax Matters Partner according to the operating agreements for these companies and acting in

concert with Gelman.

103.    The defendants Firer, EZ Capital, Star Capital, and Star Equities acted knowingly

or with severe recklessness in manipulating Plaintiff into purchasing the securities in the Closely

Held Companies, and then manipulating Linco into selling the securities in Star Capital to Star

Equities.

104.    A strong inference of the defendants' fraudulent intent may be found in the

circumstantial evidence of conscious misbehavior, including (a) the failure to disclose that

unregistered securities could not be sold to Linco except in a transaction exempt under the

securities laws, (b) the desire of Gelman and Firer that Khazarov not discuss his investments in the Closely Held Companies with Roman Khomenko accompanied by the concealment of Roman Khomenko's investments in EZ Capital and Unified Advance by the defendants; (c) the underhanded manner in which Gelman obtained a general release for himself and Unified Advance by asking Khazarov to step into a car and sign a general release, after dinner, at 11:00 p.m., to obtain $150,000 for a specific investment portfolio; (d) the misrepresentations and omissions of the defendants to induce Khazarov to take only $420,000 for Linco's investment in Star Capital and forego legal action based upon the earlier misrepresentations and omissions about Star Capital's interest in Star Development, the contributions by Star Equities and Gelman to Star Capital, and the date and price of the Land acquisition; (e) the filing of tax papers that do not identify the members of EZ Capital and Unified Advance and the failure to file any tax returns for Star Capital and the failure of Firer, as the Tax Matters Partner for at least EZ Capital and Unified Advance to see that tax information was provided to Khazarov; and (f) the refusal of Star Capital to permit Linco to inspect records of Star Capital.

105.    Further evidence of fraudulent intent exists in the motive and opportunity for Firer to make the misrepresentations and omissions. Firer knew that lies about the capital contributions of Star Equities and Gelman would assure Khazarov that the investments were being made with adequately capitalized companies. The reward for this fraud was that Star Equities directly received $780,000 of Linco's money. Firer had the opportunity to commit this fraud due to the youth and inexperience of Khazarov who was impressed by the defendant's position in business and the world of diplomacy, and, therefore, prone to being inveigled by Firer and his sidekick who sung Firer's praises to Khazarov.

106.    Had Plaintiff known of EZ Capital, Star Capital, Star Equities, and Unified

Advance's misstatements as to capital contributions and/or omission of truth regarding capital contributions, and had Plaintiff known that Defendants EZ Capital, Star Capital, Star Equities and Unified Advance could not lawfully sell unregistered securities to Plaintiff in non-exempt transactions without prior registration, Plaintiff would not have purchased any of the securities. Put another way, a reasonable investor, like Plaintiff, would view the misstated or omitted fact's disclosure as significantly altering the total mix of available information.

107.    Plaintiff justifiably relied on Defendants' misrepresentations and omissions concerning the securities, taking into consideration:

- Plaintiff's unsophistication in matters involving finance and securities;

- Existence of a fairly short-term business and personal relationship between Plaintiff's principal and Defendant Firer;

- Plaintiff's lack of independent access to information concerning Gelman and Star Equities' capital contributions into the Closely Held Companies, and omissions concerning non-exempt status of the unregistered securities;

- Defendants EZ Capital, Star Capital, and Star Equities, owed a fiduciary duty to Plaintiff by virtue of Plaintiff's membership in the Closely Held Companies;

- Defendants EZ Capital, Star Capital, and Star Equities concealed the misrepresentations and/or omissions regarding capital contributions and/or regarding the fact that Plaintiff is purchasing securities which must have been registered with the Securities and Exchange Commission, but in fact were not; and

- Defendants EZ Capital, Star Capital, and Star Equities initiated the stock

transactions and/or sought to expedite them.

108.    As a proximate result of the defendants' deception and/or manipulation in connection with the purchase and sale of securities, Plaintiff received worthless, unregistered securities in non-exempt transactions conducted over a nine-month period. In return, the defendants took capital contributions from Linco in the amount of $1,480,000. The defendants added no capital contributions of their own. Instead, the defendant misused Linco's contributions in business enterprises operated for the benefit of Firer, Gelman, and affiliated persons. The securities were worthless because without contributions from the defendants, there was no means to grow the business of any of the Close Held Companies. Because the defendants have returned only $570,000, Linco has suffered out-of-pocket losses in the amount of at least $910,000.

109.    Defendants EZ Capital, Star Capital, and Star Equities' deception and/or manipulation in connection with the purchase and sale of securities was proximately responsible for Plaintiff's loss. As stated in paragraphs 1–4, 21–27, 29–38; 40–45; and 46–87, Defendants' lies about capitalization, and failures to contribute capital as and when represented, and the failure to obtain the requisite license to own shares in Star Development Limited, the company owning Project Beouf land in Grenada, collapsed the operations of EZ Capital and Star Capital, and with that collapsed Plaintiff's investment.

### COUNT II: LIABILITY OF CONTROLLING PERSONS
### 15 USC § 78t
### [FIRER]

110.    Plaintiff restates the allegations in paragraphs 1 through 96 entirely.

111.    Defendants EZ Capital, Star Capital, Star Equities committed a primary violation of the Exchange Act of 1934 as more specifically alleged in Count I.

112.    By virtue of being the manager(s) of the Closely Held Companies and of Star

Equities, the defendants sued in this count had the power to control the general business affairs of the Closely Held Companies and Star Equities, and had the power to directly control or influence the specific company policies that created the scheme and/or that resulted in the sale of securities to Plaintiff as alleged above.

113.   Defendant Firer had control over all essential aspects of the statements made in the operating agreements of the Closely Held Companies, including those misrepresenting the capital contributions into the Closely Held Companies.

114.   Defendant Firer had control over the bank accounts of the Closely Held Companies and Star Equities, which received funds from Plaintiff's principal, and which remitted funds to Plaintiff, in connection with the sales and purchases of the securities.

115.   As a direct and proximate result of Defendants' deception and/or manipulation in connection with the purchase and sale of securities in the Closely Held Companies, Plaintiff purchased $1,693,000.00 worth of unregistered securities in a nine-month period and suffered economic losses in the amount to be proven at trial.

### COUNT III: VIOLATION OF THE FLORIDA'S SECURITIES INVESTOR PROTECTION ACT FLA. STAT. §§ 517.011 *ET SEQ.* [ALL DEFENDANTS]

116.    Plaintiff restates the allegations in paragraphs 1 through 96, and 98 through 109.

117.   Defendants EZ Capital, Star Capital, and Star Equities acted at least negligently in manipulating Plaintiff into purchasing securities in the Closely Held Companies, and then in manipulating Plaintiff into selling securities in Star Capital.

118.   Any agent of seller which has personally participated in sale of security is liable for FSIPA violations, whether agent is corporation, partnership, or natural person. Defendants Star Equities, and Firer, as persons directors, officers, partners, or agents of the Closely Held

Companies, are jointly and severally liable to Plaintiff.

### COUNT IV: ENFORCEMENT OF RIGHT TO INSPECTION OF BOOKS AND RECORDS FLA. STAT. § 605.0411
### [STAR CAPITAL]

119.    Plaintiff restates the allegations in paragraphs 1 through 96 entirely.

120.    Pursuant to section 605.0602 of the Florida Statutes, Plaintiff is a dissociated member of Star Capital, because on or about September 12, 2019, Star Capital had notice of Plaintiff's express will to withdraw as a member, as more particularly stated in paragraphs 81–84, above.

121.    On April 21, 2020, Plaintiff made a written request to Star Capital for inspection of books and records in compliance with Fla. Stat. § 605.0410 – describing with reasonable particularity the information sought, the purpose for seeking such, and how it was directly connected to such purpose – to determine Plaintiff's right as a dissociated member, concerning entitlement, and ownership value of and in Star Capital and in Unified Advance while a member.

122.    Defendant Star Capital, also in writing, unlawfully denied Plaintiff's right for inspection provided by Chapter 605 of the Florida Statutes.

### COUNT V: FRAUDULENT MISREPRESENTATION
### [EZ CAPITAL, STAR CAPITAL, STAR EQUITIES, FIRER]

123.    Plaintiff restates the allegations in paragraphs 1 through 96 entirely.

124.    Defendants sued in this count made false statements concerning a material fact. As more specifically stated in paragraphs 1–4, 21–27, 29–38; 40–45; and 46–87, Defendants' lies about capitalization, and failures to contribute capital as and when represented, and the failure to obtain the requisite license to own shares in Star Development Limited, the company owning Project Beouf land in Grenada, collapsed the operations of EZ Capital, Unified Advance, and of the Star Capital, and with that collapsed Plaintiff's investments into these companies.

125. Defendants knew the statements were false when they made them.

126. Defendants intended that Plaintiff would rely on these false statements so that Plaintiff would invest its money into Closely Held Companies believing that the other interest-holders, including Star Equities, would have their own funds at risk, or "skin in the game."

127. Plaintiff reasonably relied on Defendants false statements, since the falsity could have not been discovered by Plaintiff, because the knowledge about capital contributions was in Defendants' sole possession and/or control.

128. The false statements were a legal cause of Plaintiff's financial losses of at least $910,000.00, all stemming from the purchases of units in the Closely Held Companies and purchases of the investor's or investment portfolios sold to Plaintiff by EZ Capital, Unified Advance, and Star Equities.

129. Based upon the intentional misconduct underlying the claim for relief made in this count, the defendants are liable for punitive damages.

## COUNT VI: JUDICIAL DISSOLUTION OF EZ CAPITAL FUND LLC AND APPOINTMENT OF A RECEIVER, FLA. STAT. §§ 605.0702, 605.0703

130. Plaintiff restates the allegations in paragraphs 1 through 96.

131. This direct action by Plaintiff as a minority member is brought pursuant to section 605.0702 of the Florida Statutes for judicial dissolution of EZ Capital and for other ancillary, equitable and injunctive relief. Due to the conduct of the majority interest owners that is fraudulent, it is not reasonably practicable to carry on the business of EZ Capital in conformity with the operating agreement, so that dissolution of EZ Capital is justified pursuant to section 605.0702 of the Florida Statutes.

132. Defendant Star Equities and Gelman's who were and are in control of EZ Capital have acted, and are acting, in a manner that is illegal and fraudulent, causing injury to Plaintiff,

which conduct includes:

      (a)     lying to Plaintiff in the operating agreement and amendment thereto about the amounts of Gelman's and Star Equities' financial contributions into EZ Capital; and/or

      (b)     concealing from Plaintiff that membership units in EZ Capital were unregistered non-exempt securities, and that EZ Capital functions as an illicit fundraising scheme in derogation to Federal and Florida securities law, as more particularly alleged in previous counts.

133.    The above-described conduct of Defendant Star Equities and Gelman's is at the basis of illegality of EZ Capital's substantially all activities, and/or conduct by controlling members towards Plaintiff that is illegal or fraudulent. Because of this conduct, Plaintiff no longer trusts Defendant Star Equities and/or Gelman. Without this trust, it is no longer practicable to carry on the business of EZ Capital.

**WHEREFORE**, Plaintiff Linco Enterprises LLC respectfully requests the Honorable Court as follows:

(a)     Rescind the operating agreement between Plaintiff and EZ Capital Fund LLC and order the return of $600,000.00 paid as consideration for purchase of the membership units in EZ Capital Fund LLC, together with prejudgment interest on same amount;

(b)     dissolve Defendant EZ Capital Fund LLC pursuant to section 605.0702, and appoint a custodian to manage the business affairs of Defendant EZ Capital Fund LLC pursuant to section 605.0703(4) of the Florida Statutes;

(c)     Award Plaintiff actual damages arising out of purchase and sale of membership units in Star Capital Management LLC in the amount to be proven at trial but no less than

$60,000.00, together with prejudgment interest;

(d)     Award Plaintiff actual damages for fraudulent misrepresentation arising out of purchase and sale of membership units and of investment portfolio in Unified Advance LLC in the amount to be proven at trial but no less than $250,000.00, together with prejudgment interest;

(e)     Award Plaintiff such additional damages, over and above the amount of their actual damages, including, without limitation punitive damages that are authorized and warranted by law;

(f)     Order EZ Capital Fund LLC, and Star Capital Management LLC to provide accounting and settlement of claims and liabilities arising out of their fiduciary relationship with Plaintiff;

(g)     Order Star Capital Management LLC to provide copies of books and records in compliance with Fla. Stat. § 605.0410;

(h)     Award Plaintiff court costs and attorney's fees pursuant to Fla. Stat. §§ 517.211, and 605.0411; and

(i)     Award such other relief as this Court deems just and appropriate, including, without limitation nominal damages.

Respectfully submitted,

*Co-Counsel for the Plaintiff*

GHERMAN LEGAL

777 Brickell Ave Ste 500
Miami, Florida 33131-2803
Phone: (305) 889-7890
sgherman@ghermanlaw.com

By: ___*/s Sergiu Gherman*_____
    Sergiu Gherman, FBN 37031

*Co-Counsel for the Plaintiff*

BENNETT & AIELLO
*Temporary Address for Mail*
3471 Main Highway, Suite 206
Coconut Grove, Florida 33133-5929
Phone: (305) 358-9011
paiello@bennettaiello.com

By: ___*/s Paul Aiello*_____
    Paul Aiello, FBN 0909033

**C**ERTIFICATE OF **S**ERVICE

I HEREBY CERTIFY that on March 25, 2021 the foregoing document is being served this

day on all counsel or pro se parties identified below in the manner specified, either via transmission

of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those

counsel or parties who are not authorized to receive electronically Notice of Electronic Filing.

By: ___/s/ Sergiu Gherman_____
Sergiu Gherman, FBN 37031

34