**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:20-cv-22234- MARTINEZ-BECERRA

LINCO ENTERPRISES, INC.,

    Plaintiff/Counter-Defendant,

v.

OLEG FIRER, EZ CAPITAL FUND, LLC,
STAR CAPITAL MANAGEMENT, LLC,
and STAR EQUITIES, LLC,

    Defendants/Counter-Plaintiffs.

_____/

## PLAINTIFFS RESPONSE TO DEFENDANTS' RULE 56 MOTION
(With Memorandum of law in Support)

Plaintiff, Linco Enterprises, Inc. ("Linco"), pursuant to Rule 56 of the Federal Rules of Civil Procedure, files this Response to the Motion for Summary Judgment (the "Motion"), ECF 90 of the Defendants, Oleg Firer, EZ Capital Fund, LLC ("EZ Capital"), Star Capital Management, LLC (Star Capital"), and Star Equities, LLC ("Star Equities").

## INTRODUCTION

The Defendants request summary judgment on Linco's federal and state securities claims in Counts 1 and 3 and its common law fraud claim in Count 5 based upon two arguments. First, the Defendants assert that Linco cannot prove a genuine issue of material fact with respect to the element of "loss causation" or "proximate cause." Second, the Defendants assert that the

misrepresentations sued upon by Linco were negated by written agreements that the parties executed in connection with the investments in 2017 (the "2017 Agreements").

Next, the Defendants request judgment on Linco's claim in Count 4 to enforce its inspection rights under Section 605.0411 of the Florida Statutes based upon their position that Linco is not a "dissociated" member of Star Capital.

As to the first argument with respect to Counts 1, 3, and 5, Linco asserts that the Defendants have not met their burden to demonstrate the non-existence of genuine issue of material fact with respect to "loss causation." Instead, the Defendants gloss over the facts in the record and contending, without explaining why or citing record evidence, that either Linco's subsequent transactions with the Defendants or the Pandemic caused all of Linco's losses years after Linco made the investment. Instead, the record shows that Linco was damaged the moment it was induced to invest in EZ Capital, Star Capital, and Unified Advance, LLC ("Unified Advance") (collectively, the "Closely Held Companies"). Because the Defendants misrepresented that they had contributed $6.816 million to the Closely Held Companies, the membership interests purchased by Linco were worthless the moment Linco acquired them and turned over $1.38 million to the Defendants.

As to the second argument based upon the Defendants' construction of the written operating agreement ("OA") used for EZ Capital and Unified Advance and Amendment No. 1 to the OA for Star Capital (the "Star Capital Amendment"), Linco asserts that the Defendants' construction of these documents (the "2017 Agreements") must be rejected based upon familiar contract construction principles.

Finally, the third argument with respect to Count 5 is due to be rejected based upon the plain meaning of the language used in the Class B Common Share Purchase Agreement (the "Purchase Agreement").

## THE FACTS

Linco relies upon its Opposing Statement to Defendants' Statement of Material Facts (PSOMF) to set forth the genuine issues of fact that are in dispute.

## STANDARD OF REVIEW

The Defendants' statement of the Standard of Review is erroneous in one important respect. To the extent that the Defendants' motion is based upon the absence of a genuine issue of fact, the Defendants, as the moving party under Rule 56, must either "submit affirmative evidence that negates an essential element of the nonmoving party's claim, . . . [or] demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The mere assertion by a defendant moving for summary judgment that the plaintiff "has not produced any evidence" to support an essential element of the plaintiff's claim does not satisfy the burden that Rule 56(a) imposes. *See* 10A Fed. Prac. & Proc. Civ. § 2727.1, at 491–92 ("[T]he party moving for summary judgment cannot sustain its burden ... merely by asserting that the nonmovant lacks evidence to support its claim."). The Defendants' unparticularized assertion that Linco's losses resulted from the Pandemic or its execution of the Settlement Agreement & Release in June 2019 and the Purchase Agreement in September 2019 (collectively, the "2019 Agreements"), the Defendants have not carried their burden under Rule 56.

## ARGUMENT AND AUTHORITIES

### 1. Linco Can Demonstrate Loss Causation of Proximate Cause.

**Proximate Cause and Loss Causation.** Ordinarily, proximate cause is a triable issue for a fact-finder, *Martinez v. Spear Safer CPAs & Advisors*, 06-60727-Civ-Dimitrouleas 2007 WL 9700782, at *3-4 (Jun. 26, 2007) (so stating) (denying Rule 56 motion), and loss causation is applied on a case-by-case basis to the wide variety of transactions to which Rule 10b-5 is applicable. *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997) (rev'g judgment for investors); *see also EP Medsys. v. Echocath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000) (rev'g dismissal of investors' claim) (citing several circuit court cases including *Robbins* for proposition that there is not a single "strict test" for loss causation).

Thus, the test for loss causation has been expressed generally, including whether the misrepresentation (1) "touches upon the reasons for the investment's decline in value." *Robbins*, 116 F.3d at 1447, (quoting *Huddleston v. Herman & MacLean,* 640 F.2d 534, 549 (5th Cir. Unit A 1981), *aff'd in part, rev'd in part on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)), (2) "related in a reasonably direct way" to a plaintiff's loss, *Anderson v. Transglobe Energy Corp.*, 35 F. Supp. 2d 1336, 1369 (M.D. Fla. 1999) (denying 12(b)(6) motion), *followed in*, *Skypoint Advisors, LLC v. 3 Amigos Prods. LLC*, No: 2:18-cv-356-FtM-29MRM, 2019 WL 4600409, at *8 (M.D. Fla. Sept. 23, 2019) (same).

In all cases, just as the Defendants acknowledge, the fraud committed need not be the "sole and exclusive" cause of Linco's injury, but rather a "substantial" or "significant contributing cause." Motion, p. 4 (citing *FindWhat Inv. Grp. V. findWhat.com*, 658 F.3d 1282, 1309 (11th Cir. 2011) (rev'g summary judgment on loss causation)). "To recover, the plaintiff need not show that the defendant's act was the sole and exclusive cause of the injury he has suffered; 'he need only

4

show that it was substantial, i.e., a significant contributing cause.'" *Bruschi v. Brown*, 876 F.2d 1526, 1531 (11th Cir. 1989) (quoting *Wilson v. Comtech Telecommunications Corp.,* 648 F.2d 88, 92 (2d Cir.1981)).

Many of the authorities cited in the Motion, pp. 4-7, are actually inapposite because the cases involve scenarios distinct from the circumstances present here, including cases that involve a "fraud-on-the-market," *Meyer v. Greene*, 71- F.3d 1189 (11th Cir. 2013); *FindWhat Inv. Grp. V. FindWhat.com*, 658 F.3d 1282 (11th Cir. 2011); *Sapssov v. Health Mgmt. Assocs, Inc.*, 22 F. Supp. 3d 1210 (M.D. Fla. 2014); or a supervening general decline in the relevant market, *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713 (11th Cir. 2012); or the failure of a business based upon other circumstances wholly unrelated to the defendant's misrepresentation. *Sherban v. Richardson*, 445 So. 2d 1147, 1148 (Fla. 4th DCA 1984).

None of the cases cited by Defendants provide the applicable rule for deciding this case. In a fraud on the market case, the defense of "loss causation" often arises because "[t]easing out the effect of market conditions in fraud-on-the-market cases is essential because the fraud alleged involves a manipulation of stock price." *U.S. Commodity Futures Trading Comm'n v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1334 (11th Cir. 2018) (aff'g denial of Rule 56 motion). However, if the facts of a case do not involve the manipulation of a publicly traded stock, as is true here, "there is no need to ask . . . whether the Defendants' fraud, rather than independent market forces, causes the victims' losses." *Id.* As a matter of "bedrock policy,"  if a defendant's fraud "touches upon" or relates in a "reasonably direct way" to the investor's loss, proximate cause is satisfied because loss is foreseeable. *Id.* at 1335 (citing *United States v. Turk*, 626 F.3d 723, (2d Cir. 2010) (holding that loss causation cannot be used to permit "fraudsters to roll the dice on the chips of others, assuming all of the upside benefit and little of the downside risk.")).

In cases that do not involve stock price manipulation of a stock traded on an exchange, loss causation rests more upon foreseeability, the cornerstone of proximate cause. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, (9th Cir. 2016) (rev'g in part 12(b)(6) dismissal) ("the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss."); *see also Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 186 (2d Cir. 2001) (rev'g summary judgment) ("While transaction causation is generally understood as reliance, loss causation has often been described as proximate cause, meaning that the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission.") *See generally* Restatement (Second) of Torts § 548A (1977).

The facts presented in this action fall within a less complex but often-recurring type of case. The defendants' fraud induced a worthless investment in a business unlikely to produce profits or likely to fail because of the very matters that the defendants misrepresented or concealed. *Bruschi v. Brown*, 876 F.2d at 531 (rev'g summary judgment) (investor established loss causation by evidence that "defendant misrepresent[ed] a stock's intrinsic worth at the time of the misrepresentation"); *Burnett v. Rowzee*, 561 F. Supp. 2d 1120, 1128-29 (C.D. Cal. 2008) (denying 12(b)(6) motion) (loss causation shown as to investment that looked more like a sham than an overvalued legitimate investment); *In re Enron Corp., Secs., Derivative & Erisa Lit.*, 310 F. Supp. 2d 819, 832 (S.D. Tex. 2004) (denying 12(b)(6) motion) (defendants' fraud created the illusion of a growing company); *Skypoint Advisors, LLC v. 3 Amigos Prods. LLC*, 2019 WL 4600409, at *8 (loss causation satisfied by allegation that film investment opportunity was actually a "façade" created by defendants).

**Application of Law to the Facts.** In this case, the Defendants have misled Linco by misrepresenting that Gelman and Star Equities capitalized the Closely Held Companies with

almost $7 million. PSOMF, ¶¶ 12, 29 43. Propped up by fraud instead of capital, there was never a viable opportunity to receive the return of its $1,380,000 investment, let alone profits. Because Gelman and Star Equities' misrepresentations of non-existent capital contributions went to the intrinsic value of the membership interests that Linco purchased, proximate cause or loss caucation exists in this case. *See Bruschi*.

*EZ Capital.* EZ Capital was a holding company for the Russian company, VGF Financing (VGF), a cash advance business for merchants in Moscow that began operating in the second half of 2016 after the Defendants obtained money from Roman Khomenko of Paulstan Group, LLC, another investor who purchased a 13.3 percent membership interest in EZ Capital in July 2016 for $300,000. EZ Capital had no other purpose according to Defendants but to serve as a holding company for VGF. Defendants' Statement of Material Facts (DSOMF), ECF-89, ¶¶ 18, 19. VGF commenced a cash advance business for merchants in Moscow in 2016. EZ Capital and its subsidiary were so undercapitalized as a result of the Defendants' misrepresentations that, according to the testimony of VGF's former employees, including its Initial General Director, the Russian company was strapped for cash the very same year that Linco made contributions of $600,000 to EZ Capital. VGF was unable throughout 2017 to fund merchants in queue for approved loans or even pay its employees. The problem never improved and after worsening in 2019, EZ Capitan began winding up its business in early 2020. Gelman split with his wife $50,000 in income reported by on EZ Capital's 2017-19. The Defendants did this without any regard for Linco, which was treated as if it were non-existent entity, never once receiving a K-1 from EZ Capital, whose tax matters partner under the OA for EZ Capital was supposed to be Firer.

Despite having invested $600,000, Linco has not received any distributions or even one iota of a benefit from its membership interest in EZ Capital.

None of these facts are unforeseeable, the crux of loss causation, given the complete falsity of the representation that EZ Capital was capitalized with $3,000,000 in contributions by Gelman and Star Equities. *See Lloyd*; *Castellano*; Restatement (Second) of Torts § 548A Worse still, the record evidence indicates that Star Equities misappropriated Linco's second contribution of $300,000 to EZ Capital. Firer told Linco to send this contribution to Star Equities, yet no evidence has been provided during discovery or is offered in the DSOMF, to suggest what ever became of this $300,000 contribution.

Based upon the evidence discussed in this section, PSOMF, ¶¶ 22, 52, 53, 56, Linco has sufficiently established a basis for finding proximate cause or loss causation for the losses sustained as a result of its investment in EZ Capital. *See Brushi*. Linco has demonstrated in a "reasonably direct way," *see Anderson*; *Skypoint*, that the Defendants' misrepresentation of capital contributions "touches upon" the reason why EZ Capital is no longer doing business and Linco has received nothing in return for its $600,000 investment. *See Robbins*.

*Unified Advance.* Unified Advance went out of business sooner than EZ Capital, in the second quarter of 2018, by which time the capital contributions from Linco and Paulstan were consumed on expenses, including rent, fees and commissions paid to affiliates of Firer and Gelman's final absorption of the $16,000 that remained at the of 2017. The Defendants did this without any regard for Linco, which was treated as if it were non-existent entity, never once receiving a K-1 from Unified Advance, whose tax matters partner under the OA for Unified Advance was supposed to be Firer. That Unified Advance was out of business less than a year is hardly unforeseeable given Firer, who was supposed to manage Unified, testified that whether Unified Advance continued to operate was "absolutely" "of no consequence" to him. PSOMF, ¶ 62 (citing Firer's testimony).

None of these facts are unforeseeable, the crux of loss causation, given the falsity of the Defendants' representation that Unified Advance was capitalized with $1,500,000 in contributions by Gelman and Star Equities. *See Lloyd*; *Castellano*; Restatement (Second) of Torts § 548A

Based upon this evidence, PSOMF, ¶¶ 22, 56. Linco has sufficiently established a basis for finding proximate cause or loss causation for the losses sustained as a result of its investment in Unified Advance. Linco has demonstrated in a "reasonably direct way," *see Anderson*; *Skypoint*, that the misrepresentation of capital contributions "touches upon" the reason why EZ Capital is no longer doing business *See Robbins*.

*Star Capital.* The purchase price that Linco paid for its membership in Star Capital was not an overvalued investment in a legitimate company with a possibility for growth or success. It was a complete sham. Supposedly, Star Capital was going to raise money for the development of a hotel on land owned by Star Development in which Star Capital supposedly held a fifty (50%) percent interest. Supposedly, the land was purchased for $3,200,000 million and had a value of $5,000,000. The truth was that Star Capital never did any business, and Star Development did not own any land when Linco invested. Star Development would not acquire any land until the following year for which it paid only $1,450,000. Worse still, Star Capital did not have any interest in Star Development. In fact, Star Capital was nothing more than a "shelf entity" without an office, a bank account, or any assets. Star Capital's only assets was Linco's $480,000 deposit. *Id.* Star Capital never reported that investment on a tax return; indeed, Star Capital never filed any tax returns. Star Capital existed for one reason only. It was the artifice by which Firer inveigled Linco's money so he could commingle it with contributions from the members in Star Development. Based upon this evidence, PSOMF, ¶¶ 38, 39, 66, 71, proximate cause or loss

causation with respect to the investment in Star Capital has been sufficiently established by Linco. *See Burnett*; *In re Enron*; *Skypoint*,

Linco never received any distribution or other benefit as a result of its being a member in the Closely Held Companies. PSOMF, ¶¶ 22, 36(b), & 37. While Linco received $150,000 in June 2019 for what it believed to be a settlement of its investment portfolio in Unified Advance, the document also terminated his membership interest in Unified Advance. Similarly, he received $420,000 for the sale to Star Equities of his membership interest in Star Capital, but this was not a distribution or benefit of being a member in Star Capital. Neither of these payments, however, can be regarded as a benefit of membership or a distribution. On the contrary, these payments merely mitigate Linco's losses before it discovered the Defendants' fraud.

*Defendants' Misapplication of the Law to the Facts.* Much of the Defendants' analysis of proximate cause assumes that the Closely Held Companies would have failed, regardless of the falsity of Gelman and Star Equities' representations that they capitalized the companies with almost $7 million. Motion, pp. 6-9. Unlike the PSOMF, the DSOMF is devoid of any record evidence that confirms the Defendants' theory that the Closely Held Companies would have failed regardless of how they were capitalized.

Defendants' first argument about the cause of Linco's losses is to blame a disease that has impacted much of the world. (Linco's losses were actually due to independent factors, or supervening events, such as" the Covid-19 pandemic . . ..”). This argument is not supported by any material fact in the DSOMF. Moreover, it is not credible to suggest that Unified Advance went out of business in the first quarter of 2018 and EZ Capital began winding down its business in early 2020 because of a pandemic that went unobserved in the United States and Russia until March 2020. See https://www.who.int/news/item/29-06-2020; https.//www.sciencemag.org/news/

2020/03/new-coronavirus-finaly-slamming-russia-country-ready.

Defendants' second argument is that the time that passed between the misrepresentations in 2017 and Linco's losses, two to three years later according to Defendants, means that defendants are entitled to judgment under Rule 56. Motion, pp. 6-8 (citing *Sapssov*, 22 F. Supp. 3d 1210).¹ This argument, however, has nothing to do with the evidence in the record. According to the PSOMF, Linco's damages were proximately caused in 2017 when Linco purchased worthless membership interests in the Closely Held Companies based upon the Defendants' misrepresentations that these companies were going concerns capitalized with nearly $7 million in contributions from Gelman and Star Equities. The fact that Linco did not discover the truth about its worthless investments until early 2020, PSOMF, Exhibit 1, Answer to No. 7, p. 12 (last sentence), does not change the fact that Linco paid $1,380,000 for investments destined to fail.²

Defendant's third argument is that Linco's damages on the investments in Star Capital and Unified Advance were the result of Linco's decision to sell the investments. That Linco received thirty percent of the total amount invested in the Closely Held Companies does not alter the fact

---

¹¹ Defendants describe *Sappsov* to suggest that loss causation cannot exist if damages are not sustained until 11 months after the misrepresentation is made. This misleading. In *Sappsov*, the investor made a "fraud-on-the-market" claim, alleging company-wide Medicare fraud, yet a 60 Minutes segment revealed that Medicare fraud did not exist at 66 of the company's 70 hospitals. 22 F. Supp. 3d at 1231. In response to the plaintiff's after-thought that the 60 Minutes segment be treated as a corrective notice, the Court noted that the stock price actually increased after the segment and was 11 months "after the close of the Class Period." *Id.* Sappsov does not stand for the proposition for which Defendants cite it nor is a helpful authority to the dissimilar facts presented in this case.

² Even though Khazarov did not realize in 2019 that Linco had been the victim of a fraudulent scheme, he sought a return on investments in a foreign nation that had produced nothing in a two-year period. In hindsight, Kharavov's decision to mitigate his losses for reasons then unknown to him was a wise one. The Defendants are entitled to a set-off for that part of Linco's losses in Star Capital that were recouped. The money returned by Gelman and Unified, however, did not even cover what was owed Linco on the investment portfolio loan. ECF 93, ¶ 7.

that Linco deserves to be whole for the losses in EZ Capital ($600,000), Unified Advance ($300,000), and Star Capital ($90,000). To suggest that the 2019 Agreements are an intervening cause of Linco's losses is a canard. Unified Advance was already out of business, and Star Capital was never in business. The notion that the 2019 Agreements somehow cut off rights or claims against the remaining Defendants is especially galling given the underhanded manner in which these documents were obtained from Linco. ECF 93, ¶ 8; PSOMF, ¶ 46.

In conclusion, the Defendants' argument seems to be that Linco's losses are because the Closely Held Companies were legitimately operated businesses that failed. The Defendants argue in the alternative, that regardless of how the Closely Held Companies may have been operated, the Pandemic would have destroyed them. The final argument is to blame the victim by arguing that Linco caused its own losses by seeking a return of its investment before the Defendants could turn a profit. When it comes to proximate cause, a defendant cannot expect the plaintiff to have to disprove an alleged intervening cause. "Questions of proximate cause arise when more than one factor can be identified as the cause of any particular event, or harm. However, to have been the cause (or one cause) of a particular event, any given factor must have contributed to the actual outcome; events which occur after the injury has occurred cannot be said to have caused the injury." *Ambassador Hotel Co., Ltd. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1029 (9th Cir. 1999) ([Plaintiff] . . . did not have to prove that the hotel project would have succeeded if the misrepresentations made by defendants had been accurate; [Plaintiff] . . . had to prove only that the deception practiced by defendants caused its injury, in the sense that no other factor could more properly be said to have been the legal cause.")

## 2. The Operating Agreements Support Linco's Allegations.

**Operating Agreements in General.** Florida courts have recognized that operating agreements for limited liability companies should be construed according to rules of construction applicable to any contract. Typically, if a limited liability company has a written operating agreement, that document is determinative because there are few mandatory rules under Florida Revised Limited Liability Company in Chapter 605 of the Florida Statutes. See, e.g., In re Men's Med. Clinic, LLC, No. 6:14–bk–08623–KSJ, 2014 WL 3973161 (Bankr. M.D. Fla. Aug. 7, 2014) ("Very few limited liability companies operate without operating agreements, so the law interpreting Chapter 608 [prior act] of the Florida Statutes as a gap-filler is sparse").

**OAs for EZ Capital and Unified Advance.** The OAs for EZ and Unified Advance are identical. Both companies used the same thirty-nine page template that was prepared by either Firer or his attorney. Contract construction always begins with the plain meaning of the contract. The Defendants argue that they are entitled to summary judgment based upon the language in the operating agreement that was used. However, in neither the DSOMF nor the Motion do the Defendants quote all of the operative language. By use of ellipsis, they have fail reconcile the argument that they have concocted with the plain meaning of the document's relevant provisions: Analysis should be begin with the full definition of "Capital Contribution" in Section 1.04 of the agreement:

> 1.04 **Certain Definitions and Agreements.** As used in this Agreement, the following terms have the meanings ascribed to them in this Section 1.04 and include the plural as well as the singular number:
>
> . . .
>
> "'Capital Contribution' means the total cash and Fair Market Value [FMV] of other property contributed to the equity of the Company by a Member, which shall be equal to the amount stipulated in

<u>writing by said Member and the Company, as determined by the Board in good faith. The transfer of liabilities to the Company in connection with a transfer of money or property to the Company shall reduce the net amount of the Capital Contribution by the amount of said liabilities</u>." (emphasis added to underscore what Defendants overlook).

Article III of the operating agreement sets forth the relationships among members and rules relating to capital contributions. In the following provision, the parties agreed as follows:

> 3.03 **Company Capital; Representations and Warranties Regarding Contributions.**
>
> (a) <u>Capital Contributions.</u> "The Members and Warrant Holders have made (or are deemed to have made) Capital Contributions with respect to Class A Units, Class B Units and Warrants in amounts reflected opposite each Member's name in <u>Exhibit A</u> [information for Members] and <u>Exhibit B</u> [information for Warrant Holders-there were none in either company] hereto (<u>or shall make them at such times as agreed to by the Company in writing</u>) and such amounts shall be credited to each Member's Capital Account. . . ." (emphasis added to underscore what Defendants overlook).

Finally, Exhibit A to the OA for EZ Capital and the OA for Unified Advance sets forth, in a tabular format, the Capital Contributions for Gelman, Star Equities, and Linco. Exhibit A to the OA for Unified Advance reads as follows:

| Name and Address of Member | Capital Contribution and Initial Capital Account of the Member | Number of Class A Units Issued to the Member |
|---|---|---|
| GARY GELMAN<br>15811 Collins Ave, 1704<br>North Miami Beach, FL 33160 | $750,000 | 450 Class A Units<br>Represents 45% of issued and outstanding shares |
| STAR EQUITIES, LLC<br>c/o Oleg Firer<br>3265 NE 167thd Street<br>North Miami Beach, FL 33160 | $750,000 | 450 Class A Units<br>Represents 45% of issued and outstanding shares |
| SERGEY KHAZAROV<br>LINCO ENTERPRISES, INC.<br>3800 S. Ocean Drive 216<br>Hollywood, FL 33019 | $300,000 | 100 Class B Units<br>Represents 10% of issued and outstanding shares |

| | Totals: | $1,800,000 | 900 Class A Units 100 Class B Units |
|---|---|---|---|

Exhibit A for the OA for EZ Capital presents the information the same exact way, except the contributions of $1,500,000 for each of Gelman and Star Equities and $300,000 for Linco aggregate to $3,300,000 and Gelman and Star Equities were each allocated 475 Class A Units for a 47.5% interest in the issued and outstanding shares of EZ Capital and Linco 50 Class B Units for a 5% interest in the issued and outstanding shares. When Linco invested another $300,000 in EZ Capital in July 2017, Amendment No. 1 to OA for EZ Capital (the "EZ Capital Amendment was prepared, which indicated that Linco's Capital Contribution was increased to $600,000 and he was allocated 100 Class B Units or 10% of the issued and outstanding shares. Gelman's and Star Equities' information remained the same except they interest in the issued and outstanding shares ws diluted to 45 percent.[3]

**Contract Construction Rules.** According to Florida law, when a court construes a contract, the plain meaning of all of its relevant provisions must be read, in *pari materia*, and no provision should be regarded as "mere surplusage" or "redundant." *Equity Lifestyle Props, Inc. v. Fla. Mowing & Landscape Serv., Inc.*, 556 F.3d 1232, 1242 (11th Cir. 2009). Without explaining why, the Defendants argue that they are entitled to judgment because the Court may "deem" them to have made to the Closely Held Companies the Capital Contributions that they represented Linco

---

[3] Neither the OA for EZ Capital nor the OA for Unified Advance disclosed any information about Paulstan Group, LLC ("Paulstan Group") owned by Roman Khomenko. When Paulstan Group invested in EZ Capital and Unified Advance in 2016, Paulstan Group received Exhibit A tables that stated Gelman and Star Equities had each contributed only $500 to EZ Capital and Unified Advance.

that they had made. No explanation is offered why the Court should take this approach. As demonstrated below, neither the record evidence or applicable would support this result.

If all of the evidence is considered, Gelman's and Star Equities' cash contributions to EZ appear to be $0. Not a single deposit into EZ's Wells Fargo account has been shown. According to documents signed with the Paulstan Group, each contributed only $500. Any cash contribution noted in the 2017-19 tax returns for EZ do not appear to count under Section 3.03(a) unless Gelman was obligated to make them at specific "times as agreed to by the Company in writing." No such writing has been produced. However, even if such a writing were to turn up now, the grand total of these contributions is only a few thousand dollars. The Note given by Star Equities to VGF (the "Note"), does not prove a cash contribution to EZ, even assuming the Note was funded. Moreover, if it were deemed a cash contribution, the "net amount of this contribution under Section 1.04 of the OA for EZ Capital is less than $0 as VGF was obligated to repay the Note with 12% interest.

In the case of Unified, even though no deposit was made into Unified's bank account, Gelman and Star Equities can argue they each contributed $500, assuming the document that they executed with Paulstan Group is taken at face value. It is difficult to fathom how $75,000 transferred to a competitor of Unified Advance months after Unified Advance went out of business can be a contribution to Unified Advance. Making that assumption for the sake of argument, the loans by Star Equity to Mega M are not in conformity with the requirement of Section 3.03(a) as Star Equities has not produced a writing signed by Unified Advance that obligated Star Equities obligated to advance $75,000 to Mega M.

Finally, neither Gelman not Star Equities have proven any cash contributions to Star Capital. would have been future contributions no. PSOMF, ¶¶ 48-50. Thus, there is absolutely no evidence advanced by the Defendants to justify that each of Gelman and Star Equities should be

"deemed to have made" contributions in the amount of $3,408,000, even though it appears that each made cash contributions between only $0-1,000.

One way a member could be "deemed to have made" a contribution under this operating agreement, would be in the case of a property contribution according to Section 1.04. That provision requires a fairness procedure be followed for contributions of property. Section 1.04 states that a member may receive credit for a property contribution, provided there is a writing by which the member and the Company stipulate to the "Fair Market Value" of the property based upon a "good faith" determination of the board. Viewed in context, the phrase "deemed to have made" in Section 3.03(a) becomes logical as it suggests a harmonious construction with this fairness procedure in Section 1.04. *See Equity Lifestyle*.

By comparison, the Defendants' use of the phrase "deemed to have made" suggests that they wish to receive credit for any contribution that they deem themselves to have made to the Closely Held Companies. This construction would appear to violate the "rule of validity," which requires that a contract be construed whenever possible not to render a contracting party's promise illusory unless the plain meaning of the language absolutely requires that result. *J.R.D. Mgmt. Corp. v. Dulin*, 883 So. 2d 314, 316-17 (Fla. 4th DCA 2004). Obviously, if the operating agreement were ambiguous on this point, the canons of construction require an interpretation that affords a just and reasonable result instead of an unfair or harsh result. *See Calderon v. Sixt Rent a Car, LLC*, 5 4th 1204, 1210 (11th Cir. 2021). Further, if the operating agreements were ambiguous, the law would require the contracts be construed against the drafter, which, in this case, was Firer or Gelman in all instances. *See Bussen v. Int'l Precious Metals Corp.*, 660 F. Supp. 94, 96 (S.D. Fla. 1987).

Returning to the facts, even though Defendants have submitted no record evidence in the DSOMF on the contributions of property by Gelman or Star Equities, during discovery the Defendants provided responses to interrogatories to this effect. According to the record evidence presented in PSOMF, Gelman and Star Equities have not proven even one contribution of property with any ascertainable value. Likewise, they have not offered any evidence that indicates either Gelman or Star Equities attempted to comply with the "fairness procedure" in Section 1.04.

Finally, during their depositions, Firer and Gelman made vague references to their efforts on behalf of EZ Capital and Unified Advance. There is not a word about capital contributions of service in any of the operating agreements. Notably absent from the definition of Capital Contributions in Section 1.04 is the word service. Another fundamental canon of contract construction is "expressio unius est exclusion alterius," meaning that an agreement which expresses one thing, particularly in specific language, excludes another thing that is not specified. According to Section 1.04, "Capital Contribution" means money or property contributed in accordance with the fairness procedure for property contributions. Because the operating agreements do not mention service contributions, the Court need not consider this issue. *Bacon v. Stiefel Labs., Inc.*, 677 F. Supp. 2d 1331, 1340 (S.D. Fla. 2010) (holding that discretionary power did not exist based upon this principle).

### 3. Linco is a Dissociated Member.

The Defendants continue to insist that even though Linco sold its entire interest in Star Capital, Linco occupies some sort of legal "limbo" in which it is no longer a member of Star Capital, yet not dissociated from this limited liability company. This argument is nonsensical. There is simply no practical basis for deeming deeming Linco a non-dissociated member once it transfers its entire transferable interest in Star Capital.

While there a no reported decisions under Chapter 605, other cases that have addressed this issue deem the entire transfer of a member's transferable interest to be a dissociation. *Salameno v. Rawlings*, 2021 WL 1085521, at *9 (S.D.N.Y. Mar. 22, 2021) (interpreting Florida's section 605.0602, and finding member "dissociated" when converted his investment into shares of another company); *Levine v. 418 Meadow Associates, LLC*, CV074022329, 2014 WL 2853950, at *1 (Conn. Super. Ct. May 16, 2014) (finding that member "dissociated" when her interest in the company was proportionately reduced to zero under the operating agreement, based on her failure to make a capital call to pay attorneys fees, and when minority members' interest proportionally increased as they made up the difference in the unpaid contribution).

Thus, Linco is dissociated either under 605.0601(1) or 605.0602(5)(b) of the Florida Statutes. Section 605.0601(1) makes dissociation an absolute right, stating that it can be done "at any time, rightfully or wrongfully." The sole purpose of this defense is to avoid liability to Linco for having refused and failed to properly respond to its record request to Star Capital. While there is no case in Florida that

Respectfully submitted,

| Co-Counsel for Linco Enterprises, Inc. | Co-Counsel for Linco Enterprises, Inc. |
|---|---|
| GHERMAN LEGAL<br>777 Brickell Ave Ste 500<br>Miami, Florida 33131-2803<br>Phone: (305) 889-7890<br>sgherman@ghermanlaw.com | BENNETT & AIELLO<br>Temporary Address for Mail<br>3471 Main Highway, Suite 206<br>Coconut Grove, Florida 33133-5929<br>Phone: (305) 358-9011<br>paiello@bennettaiello.com |
| By:  /s Sergiu Gherman<br>     Sergiu Gherman, FBN 37031 | By:  /s Paul Aiello<br>     Paul Aiello, FBN 909033 |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 8, 2021 the foregoing document has been this day on all attorneys of record through the CM/ECF website for this judicial district.

By: /s/ Paul Aiello